The proper name of this case is Hurston Seed Farms v. Monsanto In this video, we are going to take a closer look at Hurston Seed Farms v. Garmany  Hurston Seed Farms v. Garmany  You may proceed. Kesselman May it please the Court, my name is Mark Kesselman, and I represent the government defendants in this appeal, the Secretary of the United States Department of Agriculture and the Administrator of the Animal, Plant, Health and Inspection Service, APHIS. In this case, the lower court abused its discretion in failing to properly apply the traditional four-part balancing test for issuing a permanent injunction. With the Court's indulgence, I will reserve seven minutes of my time for interviews with the conveners and an additional five minutes for rebuttal. And I'd like to focus now on three central points. First, the lower court improperly declined to evaluate the record evidence. In the words of the district judge, quote, balancing all of these different factors and coming to a particular conclusion isn't my job during the pendency of the EIS. Second, although the lower court made passing reference to the equitable four-part balancing test, it did not actually require that plaintiffs prove that the alleged harm was either likely or irreparable or of sufficient character that it outweighs the harms that are known to result from its broad injunction. And third, the lower court failed in its duty to give deference to APHIS's scientific expertise in crafting mitigation measures and, therefore, did not meet its narrow tailoring obligations. As the Supreme Court made clear in Amico v. Village of Gambrel, a permanent injunction should not issue absent of the proper weighing under the traditional four-part balancing test, even when environmental harm is alleged. In that case, they evaluated exploratory activities in the Outer Continental Shelf and found them not sufficiently likely to outweigh the fact that the oil companies stood to lose $70 million if enjoined. This Court has recently applied Amico and its descendant eBay in holding and affirming the longstanding proposition that a procedural violation of NEPA does not itself justify broad injunctive. Why don't you tell us what the district court enjoined? In this case, the district court enjoined all future planting of Roundup Ready alfalfa, with a very narrow exception for seed that was already in the ground. Now, Roundup Ready alfalfa is alfalfa that has been genetically engineered in some way? Correct. It's through an agrobacterial modification process. It has essentially a gene inserted into it, which makes it resistant to the glyphosate herbicide. To a certain? To a certain herbicide. Herbicide. Pesticide, yes. Okay. And the reason that the injunction was entered was because there was a violation of the National Environmental Policy Act? Correct, Your Honor. The lower court found that it was a very close case, but they did, the lower court did ultimately find that there had been a violation of NEPA, and we certainly don't contest. And the violation was what? The violation was that there wasn't sufficient analysis of the risk of outcrossing. Risk of what? Cross-pollination. Cross-pollination. Wasn't the district court concerned that they hadn't studied whether this could do away with all the traditional natural alfalfa seeds? The court was concerned that the purposes of NEPA are, of course, to inform the decision maker and to inform the public about the consequences. The record below certainly indicates we're not challenging the NEPA violation, but it does indicate a substantial amount of history and study, both academic literature, as well as eight years of field testing that went into this. So I don't think that anybody can say that. Well, there was, there had been study that you have to have studies in order to come up with something new, but that's different from looking at the environmental consequences of it and the effect that it might have on existing alfalfa. Certainly, the judge did not find that the administrative record was bereft of such facts. In fact, if you look at the EA and the FONSI, which were found to be insufficient and a close call, there is a great deal of information about the study of isolation distances and the risk of outcrossing. And it is certainly undisputed in the record that, for instance, in hay-to-hay transmission, that the risk is 0.0000025 percent that outcrossing will occur, and plaintiffs don't contend that. All of their evidence is focused on the risk of, of contamination into seeds. But on the narrow tailoring point, we see that in fashioning relief, the lower court did not make any distinction between the risks associated with hay-to-hay and hay-to-seed. And the record is similarly replete with evidence which shows that, that, that east of the Missouri River, there is no seed production. And so the idea that you would have a broad nationwide injunction against all planting when the risk is almost 0 or as close to 0 as has certainly been seen in a long time, that, that indicates that there's been a lack of narrow tailoring. Kagan. What, what, what was, what, what was, you, you, you were not contesting the NEPA violation, which was what? The NEPA violation was that the government should have provided additional information on the risk of outcrossing and on the risk of weeds that would become resistant to the herbicide. And on, on both of those counts, that's not just because And so that what the, and, and you, you don't, you, you, you should have done that. There should have been. The government committed to going back and preparing an environmental, a full environmental impact statement. We, we said it would take us approximately two years to do that. But the district court then said that that's going to take a couple of years, but everything under NEPA does. And so, so the district said that until that is done, that there won't be any new planting of this substance and that the people who, of these seeds and that the people who were going to plant them could go ahead and plant them. They planned to plant them and bought them, could go ahead and plant them. There was a narrow period of approximately a week or two where farmers who had already invested in the seed and that was the season. Exactly. But, but by and large, the injunction prohibits all future plantings from March. So that would be a couple of seasons. It would be, yes, it would be approximately two growing seasons per year. And the legal question though, before this court is what do we do with the fact that we had a two year delay essentially between the time of the deregulation decision and the time of the court's injunction? More than a year of which, or I'm sorry, approximately a year of which there wasn't even a request by the plaintiffs for injunctive relief. A critical fact that courts have looked at in several cases. And I sure Well, counsel, I appreciate your argument. And in effect, you're saying because the plaintiffs did not do anything for some period of time, why is it necessary to have such an over-encompassing preliminary or over-encompassing injunction, injunctive relief? What's my standard of review here? The standard of review in, the standard of review is that overbroad injunctions are reviewed for abuse of discretion. All right. And certainly we believe that standard is not here. Well, overbroad injunctions are reviewed for abuse of discretion and good injunctions that are not overbroad are also under abuse of discretion. Bottom line is we're under abuse of discretion here. So I'm not to reweigh the evidence, am I? Well, Your Honor, the question is, you do get to ask the question of did the lower court weigh the evidence. And our contention is no. There are statements throughout the record. Well, I appreciate that, but answer my question. As an appellate judge, I can't go in and reweigh the evidence, can I? All I'm supposed to do is see whether there was an abuse of discretion on the part of the district judge. Now, the reason I'm pretty hard on that, maybe you've been here before, you saw me give lots of questions. I was a district judge. I know what happens. I don't like these appellate courts coming in and getting in my realm very easily. And I try to give, then, the standard of review in these particular situations. All right. So if I have an abuse of discretion, then I have to look about four things, irreparable harm, remedies available at law, considering the balance of hardship, and whether the public interest would not be served. If I look at irreparable harm and I look what the district judge said, it seems to me that in this case environmental harm generally makes irreparable harm in any event in some of our decisions. No, Your Honor. In fact, while I do want to reserve some time for the interveners, the case law is very clear that environmental harm does not mean a presumption of irreparable harm. That's precisely what this Court said. Well, I appreciate that it says that, but there are other decisions which environmental harm has made it sufficient likely. There are decisions that say that. And we submit that, for instance, in hay-to-hay transmission, where you have a .000025% chance that that does not amount to sufficient likelihood. Well, but irreparable harm, to talk to that, the district court said, without an EIS, how can I even determine this? And he said, therefore, on irreparable harm, it seems to me that the government hasn't given me enough evidence to suggest it doesn't. And therefore, when isolation distance restrictions were placed on the growing of crops, that still there was some contamination. The restrictions were similar to, in many ways, stricter than the government had proposed. And therefore, given all of this, and without an EIS, I better do something about it. Your Honor, that is precisely the analysis that the dissent would have applied in Northern Cheyenne Tribe that was rejected. Northern Cheyenne Tribe, Idaho Watershed, Westland Water District, High Sierra Hikers, repeatedly this Court has said that during the time when the EIS is being completed, that that is not a reason to avoid the weighing and the balancing of the harms, and that the Court is to look at the evidence and to defer to the expert scientific agency if we can come up with narrow, tailored measures. But didn't the judge here look at the and weigh the harms? Our contention is that the judge did cite the proper standard. But that A, two things. A, it has to be weighed against the multiple statements throughout the record which says it's not my job to weigh the harms while the EIS is pending. That's what the agency is supposed to be doing. I'm going to cut off all activity. Second point is we don't start the new activity until the agency has weighed the harms. But that's not what this Court has done repeatedly. For instance, in Northern Cheyenne, there was a government decision to do full development of coal bed methane. After the NEPA violation, the tribes sought to enjoin all development. The Ninth Circuit allowed partial development. Idaho Watershed, 68 permits. We affirmed an injunction. Correct. An injunction that let that happen. Right. Idaho Watershed, 68 permits, preliminary injunction issued. Ninth Circuit allows most of the grazing to occur under the permit. That's what the point of the permanent injunction exercise is. The judge did pick up a few of the marbles and put them on one side of the balancing scale. But his job is to put all the marbles down and to see how the balancing is. Now, my worry is this. Remedies available at law, I don't see any. So I'm really stuck with irreparable harm, the balance of the hardships, and whether the public interest would be disserved. If I look at the irreparable harm, I'm reading his decision and I'm trying to determine if something he did is an abuse of discretion. As to the hardships between the parties, he certainly tried to balance those. He said those who have alfalfa out there growing, we'll keep that going. All I'm trying to do is keep it as getting in there again. He had a balancing that he took. As the public interest would not be deserved, he said, well, I've got to look at abundant need for high-quality food. I've got to figure out the public interest in consumer choice. I've got to go through this. And so for an abuse of discretion basis, I'm having a tough time. That's the worry that I have here. Now, I can understand that if I were down there making those decisions, I may come out differently. But I'm not making the decision. I'm just deciding whether it's an abuse of discretion. Well, Your Honor, there have been several cases in the remedial phase where courts have found abuses of discretion. That is the Winter case. It's the National Audubon case in the Fourth Circuit where courts are actually reversing overbroad injunctions. Well, I don't care. The Fourth Circuit may do stuff, but don't cite that to me. Well, Your Honor. Cite me what my court does. Because when I was in Idaho, I'd say, don't cite me what the Ninth Circuit does. If I may quote this court in Winter just several months ago, quote, The district court did not explain why a broad absolute injunction against the use of medium-frequency active sonar in these complex training exercises for two years was necessary to avoid irreparable harm to the environment, and it remanded with instructions to narrow the injunction. So this court has done precisely what you're understandably uncomfortable in doing. Now, granted that case is a different set of facts, but the legal principle is that this court remanded for a narrowing of the injunction. You're using up almost all the time. Yes. Thank you. May it please the Court. My name is Maureen Mahoney, and I'm here on behalf of the interveners, Monsanto and Forge Genetics. I'd like to pick up with NRDC v. Winter because that is a case where just last year this court actually did reverse an injunction because the district court had entered a blanket injunction against all future training exercises without finding that a broad injunction of that kind was actually necessary to prevent all harm, and remanded so that the district court could determine what kinds of mitigation measures would prevent the harm. Well, but here's the problem. You have a little bit different situation. I looked at that case. In this situation, there isn't a blanket injunction. We're allowing an injunction. We're not enjoining the continuation of those who are already in the situation, who are going forward with their planting, that they've already used the stuff, they've already got it in. All we're doing is saying, based on the fact that I know, based on the evidence, that there's contamination of organic conventional alfalfa crops with the GE that has occurred, and such contamination is irreparable environmental harm, that in those circumstances where the irreparable harm is likely to occur, and I see that happening, and that for an irreparable harm situation, I need an EIS to help me, and therefore I'm not going to do anything more until I get it. That's what he said. Well, Your Honor, actually, in the summary judgment phase, he said that there was a substantial question about planting without any geographical restrictions might potentially eliminate over the long haul other varieties of alfalfa. There have been multiple, there are many varieties of alfalfa that have been coexisting for decades with isolation distances that are far, far less than the ones that APHIS proposed. In addition, even if you were to just look at the issue of whether there should have been a broad injunction against hay, leave seed aside for a minute, a broad injunction against hay. If we look at the plaintiff's own evidence, their expert actually at ER 125, one of their experts says that planting these fields for hay, quote, prevents any substantial risk of gene flow. And the district court never looked separately at whether he could allow hay, and there have been more than $100 million in losses to farmers who went into this business in reliance on deregulation, simply because the judge wouldn't undertake the findings about what the risk of harm would be if you allowed the planting of hay when they're not proximate to seed fields, which are only located in a small portion of the states in the west. At a minimum, he had to do that under the standards that are established under the Winter case and other cases in this court, because that would have prevented enormous harm without increasing the risks that he was concerned about. I'd like to save the remainder of the time for rebuttal. Good morning, Your Honors. May it please the Court. George Kimbrell on behalf of Appellees Geertsen Seed Farms and Associated Environmental Farming and Consumer Associations. With me today are my colleague Kevin Golden and our Executive Director, Andrew Kimbrell. This case is about the meaningful review of a new form of agricultural biotechnology that has the capacity to change the fundamental nature of alfalfa, the fourth most widely grown crop in this country, 21 million acres. However, this appeal is solely about the scope of the injunctive relief granted by the district court below. Before delving into the details, I'd like to give a brief overview with the Court's permission of what has occurred here, the crux of it. Faced with the petition to deregulate and commercialize Roundup Ready alfalfa, USDA APHIS had three options. One, unconditional deregulation and allowing the commercialization. Two, partial deregulation with some conditions in place, such as isolation distances. And three, deny the petition. It shows option one. In the environmental assessment and finding of no significant impact accompanying that deregulation, the agency did not look at any partial deregulation, isolation measures or containment measures because it did not believe biological contamination, gene flow crossing here to organic and conventional alfalfa was a significant impact cognizable under NEPA. It simply didn't look at it. The district court found, again, in the decision here unchallenged, unappealed, that that environmental assessment was arbitrary and capricious and volatile over the National Environmental Policy Act and ordered them to do a full EIS. Again, that they have agreed to do. In the interim, the district court asked for injunctive relief to be put in place, at which point APHIS chose option number two, a partial deregulation de facto in effect, as Judge Breyer said, that would allow a dramatic increase in the planting of Roundup Ready alfalfa before the agency has undertaken the environmental analysis to determine its potential significant environmental impacts. Simply put, the judge's injunctive relief here was not an abuse of discretion. He applied the proper standard supported by findings of irreparable harm in the public interest that are not clearly erroneous. He carefully balanced the equities in this case, finding that irreparable environmental harm outweighed potential financial harm to the interveners. And he carefully tailored his injunction in line with this court's precedent, preserving the status quo and allowing currently cultivated at Roundup Ready alfalfa to continue while simply not allowing an increase in the risk of that harm through future planning pending the EIS. Let me ask you a question. Isn't it true that in order to have such an injunction, he should have had a hearing? No, Your Honor. Was it waived by any party? It was not waived by any party. Were the facts in dispute? There are facts in dispute, yes. And didn't the district court not adopt the interim measures proposed by the regulating agency? He adopted some of those measures for the alfalfa already in the ground, but not for the future planting. Okay. So a hearing was requested? The interveners, yes, requested a hearing in their briefing. Well, I don't see any law in our circuit which would suggest that he shouldn't have had a hearing. This is dealt with explicitly, Your Honors, in Idaho watersheds. I read Idaho watersheds, and since I'm from Idaho, I know a little bit about it. In that particular case, they adopted the agency's recommendations, so they didn't have to have a hearing. There was, we think, an important difference in that case between here and there. In that case, the judge faced three options. One, the rancher's proposed remedy, which was no conditions on future grazing. Second, the agency's proposed remedy, which was conditions on the grazing, and third, the environmental organizations, which was stop the grazing. The judge chose the middle ground there, the middle-course injunction. That's in opposite to the situation here, Your Honor. Well, but the law, which is in Idaho, which is in that Idaho case, does not suggest that a district judge can issue an injunction without having a hearing. The law in that case is very clear. It says, well, it wasn't waived, the facts are in dispute, and frankly, the court adopted the interim measures proposed by the regulating agency, and therefore, no hearing was necessary. That did not happen here. So as a district court judge, how in the devil would he have been able to say, well, I don't need to worry about it anymore? Because he had a whole ton of information in front of him. He had no way to weigh what was going on. He had no way... In fact, one intervener might have added more stuff to it. Now we've determined. He had no way to see who could give him the correct information and who couldn't. He had nobody under cross-examination. He had no hearing in which to do, and he puts a blanket injunction, given the law that was right straight in front of him. It seems to me that that's where I say, well, this, Mr. Judge, I'd love to go along with you on abuse of discretion, but if you won't have a hearing to listen to what has to be said and have people cross-examine them so that you can really understand the methodology here, especially in these kind of tough situations, you better have a hearing, and we better get this, we better end this injunction till you do. A few points, Judge Schmitt. First, the district court did have two hearings on the scope of injunctive relief in this case, including hearing extended oral testimony from Forge Genetics President Mark McCaslin. He carefully weighed, as he said, the voluminous evidence presented by the interveners, and there was no requirement that he hold such a hearing. Where is there a case that says there's no requirement you have such a hearing? Cite me the case. The case is Idaho Watersheds, Your Honor. Let's not say that. What it says in that case, Your Honor, is that they made this very same argument in that case, that the interveners and the environmentalists should battle it out in an evidentiary hearing. And the court in that case said, rejected this catch-22 argument, saying, determining what measures are needed through extensive fact-intensive inquiry is precisely the purpose of the long-term environmental review ordered by the district court and to which no party objects. That is precisely the case here, Your Honor, with the already-begun EIS process. Well, but that isn't what it says. It says especially when they adopt the interim measures proposed by the regulating agency. That's what Idaho Watersheds says. It says that they didn't need an evidentiary hearing if they applied the proper standard and did not abuse their discretion made a finding of irreparable harm, such as was done in this case. Very simply, in the NEPA context, the evidentiary hearing is redundant as well as will prejudge the outcome of the... Why is it redundant? It doesn't seem to me that they're making any determination. Having sat in a preliminary injunction hearing myself, once or twice, you're not going to make the ultimate decision, but you are going to determine what you need to do for an injunction, how big it needs to be. Because, as we know, as we saw, there's some parts of the United States that have nothing to do with alfalfa seeding. It all has to do with the growing of alfalfa. There's some evidence that suggests other things. You've got all kinds of people coming in giving testimony. They're not subject to any cross-examination. They don't have any reason to put themselves right up against the test so that the plural district judge can make that determination. That's why we have those rules. What happened at the preliminary injunction stage? There was no preliminary injunction, motion for a preliminary injunction in this case. The motion for injunctive relief came after the summary judgment NEPA order, although injunctive relief was requested at the very outset at the complaint of this case, Your Honor. Back to your question, Judge Smith. Very briefly, interveners presented points about hay versus hay versus seed versus seed. This is essentially a myth. I mean, alfalfa is alfalfa. The risk of cross-gene flow point... Alfalfa is an alfalfa to an old alfalfa farmer. You're not going to tell them that. But go ahead. I just mean that bloom happens, Your Honor. It's all about when you cut the alfalfa. It's not a different form in any way. And as Judge Breyer found in his opinion, that their conclusion that farmers could harvest, for example, alfalfa hay before it comes to bloom is in many times dictated by adverse weather conditions. They certainly cannot always do so, and that creates the sufficient likelihood or supports the sufficient likelihood of irreparable harm through biological contamination. Certainly, on remedy, the proposal by APHIS could not, in a month's time, have done this inquiry they need to do into these types of questions, which is why he found it insufficient. There. Just going back to the evidentiary hearing issue a little briefly there, Judge Breyer's question before him was whether the irreparable harm in this case was sufficiently likely. And he had several bases for this finding, including both there was a NEPA violation in which this Court has said irreparable harm flows from the failure to evaluate environmental impacts. It is the added risk to the environment that comes when agency decision-makers make decisions without having before them the analysis and public comment of the likely effect of their decisions on the environment. That's from recent Sierra v. Bosworth. In addition, there's the record evidence here that contamination has already occurred with provisions put forth, mandated by forged genetic seed contracts, including isolation distances, that the Court found similar to those in the proposed remedy. So that, those past instances of contamination shows that this has happened, this can happen, and supports the finding that the irreparable harm in this case is sufficiently likely. Judge Breyer's determination that the harm is sufficiently likely and careful balancing of the equities, including due regard for the public interest, was his duty as finding and granting the carefully tailored injunction in this case. Help me with the evidentiary hearing. The government doesn't challenge that, I take it, the failure to... I believe only it's briefed, at least on appeal, by the intervenors. By the intervenor. And was there, what was the showing of what, what was the, what does the record show with respect to the request for the evidentiary hearing  to be offered? What was going to be offered was similar to what was presented similar to the voluminous evidence already pre-offered in front of Judge Breyer, the direct testimony declarations that he had in front of him and that he said he carefully weighed and gave careful scrutiny to in this case, in finding the sufficient likelihood in addressing these irreparable harm questions. Certainly, though, in the NEPA context, it was not his duty to prejudge the EIS process. Say, for example, Judge Breyer had concluded that these measures were sufficient and the EIS later concluded we need five miles isolation distances. What then of the reliance of the farmers in the interim there? It simply is an opposite, these cases that require the evidentiary hearing in this NEPA context. That's what it says in Idaho watersheds. Going to the question of deference, Your Honors, that was raised by the... Where in Idaho watersheds does it say that? Give me the language. The language says if you have adopted the agency's recommendations, given all of these things that's going to come in the future, you necessarily don't need a hearing. That's all it said. It didn't say you don't need a hearing in any circumstance. It doesn't say anything about you don't need a hearing if you're not going to adopt the agency's recommendations. It talks about the agency's recommendations as the adoption, and they didn't adopt the agency's recommendations here. Give me the language that says that's opposite to that. It's simply that the court in Idaho watersheds distinguished that line of cases that Your Honor is referring to. In the Ninth Circuit decision they did not distinguish any cases that suggested that they were not adopting the agency's decisions because they did. No, an evidentiary hearing was required, and they certainly didn't hold that an evidentiary, it was an abuse of discretion not to hold one in that context, Your Honor. With regards to the provisions put forward here by APHIS, by the appellants, they are simply contrary to the very purpose of NEPA, as this Court has held in a long line of well-established cases. Simply going forward without first assessing the significant potential environmental impacts of that action is contrary to the very purpose of the statute. This is why the District Court properly did not abuse its discretion in declining to put forth this proposal. What appellants argue is for wholesale adoption, not deference, Your Honors. Deference is this careful weighing of the evidence, of which Judge Breyer did. But he was under no obligation to wholesale adopt their measures. As I mentioned, he did use them for the alfalfa already in the ground in carefully balancing the equities in this case. They are also for business as usual. As I mentioned, in this case, they are substantially similar to those already in place, mandated by Forge Genetics' seed contracts. Finally, they have no sound basis in a record. The cases cited by the appellants, this Court's precedent, give due deference in most cases where there is an administrative record showing the informed decision-making process of the agency. This is put forth on remedy. As I said at the outset, they have not looked in a NEPA assessment at the adequacy of these measures. Let's see. A few points here. With regards to the standard itself, Your Honors, Judge Breyer applied the proper standard for issuance of permanent relief in this case. There was no presumption of harm. There was no automatic injunction that issued. He cited Amico, the proper precedent, and this Court's precedent interpreting that standard. He crafted his middle-course injunction only, finding irreparable harm, balancing the equities, and finding the injunction to be in the public interest. With regards to that argument, I don't know if the Court would like anything further on that. He explicitly cited the standard himself there. Going to the balancing of the equities next, Your Honors. After applying the proper standard, the District Court balanced the equities, finding that irreparable environmental harm that we've discussed here outweighed potential financial harm to the interveners. This is well supported by this Court's case law in NEPA injunction context cases particularly. As Amico has said, if sufficiently likely, irreparable harm will outweigh the favor of an injunction to protect the environment. His balance is further supported in this case by the intertwined potential economic harm from biological contamination to farmers and businesses that rely on organic and conventional alfalfa hay such as Organic Valley Dairy, the largest organic dairy cooperative in this country that relies on organic sources of alfalfa hay as its main source of feed for its dairy cattle, such as alfalfa seed farmers such as Tom Baxter, who grows conventional, unique, natural varieties of alfalfa. His business is predicated upon his ability to protect the environment from biological contamination and such as alfalfa hay exporters that export to overseas markets that reject genetically engineered material contaminated crops through market rejection. Finally, his balancing is supported by the public interest in this case as Judge Breyer gave due regard to it and carefully weighed finding that the public interest was in supporting the delaying the further introduction of Roundup Ready alfalfa penning EIS and not allowing the agency to take such action as its proposed relief would do which would dramatically increase the risk of harm through planting before that has been that analysis has been undertaken. With regards to the irreparable nature of this harm, Your Honors Irreparable harm, as the Supreme Court defined in Amico, is harm that cannot be remedied by money damages and will be of no consequence. This is precisely the type of harm we have here. Biological contamination harm will, like an invasive species, invade farmlands, contaminate other crops, alter the ecology of the weeds in those fields and significantly threaten to eliminate the ability of farmers and  non-genetically engineered alfalfa to grow and to eat. This type of harm, as the Supreme Court defined, is irreparable. GE contamination, once it occurs, cannot be undone. To address a few of the arguments here quickly made by the interveners, Northern Cheyenne is completely inapposite in this context, Your Honors. There, the Court made a finding that there would not be any irreparable harm come from that action specifically because further environmental assessment under NEPA would be required before any on-the-ground activity could be taken in that case. This is very different than the context here where the Court made a finding of irreparable harm that is not clearly erroneous. With regards to Winters, that case is also easily distinguishable. There, they made a finding that it was in the public interest to support further of these submarine activities in the national interest of national security. This is, again, a very different finding than here when we have the public interest while supporting the judge's injunction. Is this case similar to Idaho Watersheds in that what we're talking about is an injunction pending the preparation of the report and so it's not really a permanent injunction but temporary in the sense that it's only until NEPA has complied with the injunctions. Exactly, Judge Schroeder. It is very similar in that way and that is one way in which it is different to other cases. It is permanent only until the EIS is done, until that analysis is done. The cases that is most akin to here, National Parks, High Sierra Hikers, well-established cases of this Court's precedent in which district courts discretion to craft injunctions that have increased a further risk in harm which is what Judge Breyer did here by stopping the future planting while allowing already begun activities to continue in some fashion which is also what he did in this case, allowing the continued cultivation for those farmers that have relied on the deregulation and already planted. Did he say when he was looking at these declarations that if I were to have a full evidentiary hearing on these I would be doing what NEPA what the agency is supposed to do under NEPA? Yes, he did say something to that effect. Perhaps not those exact words. No, but it's sort of similar to what we said in Idaho Watersheds. He cited the exact language from Idaho Watersheds, Your Honor. Can I briefly give a closing? Okay. We ask the district court's injunction to be affirmed. Thank you, Your Honors. Any further questions? Thank you. May it please the court there are two places I'd like to focus the court's attention in the record. The first is on page 14 of plaintiff's briefs where they cite to Hammond as being one of the more credible experts here and they rely on an expert who's one of the leading agronomists who says that there is zero risk, zero risk of gene flow between seed fields at a distance of five miles. Second fact, declaration of a farmer in Colorado named Troy Walters. He lives 300 miles away from the nearest seed field. It cannot be the standard that when the plaintiffs and the expert testimony says that the greatest distance that this pollen can move is five miles and yet you have a situation where someone is 300 miles away that the court could not be abusing its discretion by permitting a farmer such as Troy in his isolated location. Second, in crafting these scientific, in crafting the mitigation measures the court we believe did have an obligation to look at what the government proposed as mitigation measures. APHIS is in the business of protecting against plant pests. That's what they do, that's what they cared about. If the agency believed that there was a legitimate risk of outcrossing during the interim two years with the mitigation measures in place, with the isolation distances, the care that went into these is not, as the plaintiffs suggest, something drawn up at the last minute in the heat of litigation. This is what APHIS does. There were approximately 250 field tests of Roundup Ready Alpha Alpha. And it is precisely these kinds of conditions that are imposed at the permit stage for alfalfa and every other plant. And so to suggest that the agency doesn't have experience in working with these mitigation measures is false. And the fact is that since 1998 there is not one iota, not one scintilla, not one suggestion in the record that any hay-to-hay transmission has in fact occurred. None. The plaintiffs don't go there. And so the government's contention is that it cannot be a narrowly tailored injunction when all of these facts are so plainly in the record that indicate that the court is sure they allowed some seeds to be put in the ground for a short period of time. But we are talking about literally hundreds of millions of dollars that are being, we are talking about farmers not being able to make their choice. We're talking about increased use of pesticides from more harmful pesticides from not being able to use the Roundup ready alfalfa. You have to put the marbles on both sides of the balancing in order to come up with a properly narrowly tailored injunction. And the court below even said, citing NRDC v. EPA, that the agency's determinations that Roundup ready alfalfa have no harmful health effects on humans or livestock that it had a duty to defer to those. And yet when it came time to talk about the risk of out-crossing which is well supported by the four leading agronomists and numerous experts, there is absolutely no deference given in that context. Your time has expired. Thank you, Your Honors. The case just argued is submitted for decision. That concludes the court's calendar for this morning and the court stands adjourned. Thank you for your arguments. Thank you. Thank you very much. This court, this session, stands adjourned.
judges: Fletcher, McKeown, Smith